PEOPLE, Respondent, v. W. E. DENNIS et al., Appellants.

No. 605; February 19, 1866.

**Equity—Jurisdiction of District Courts.**—The equity jurisdiction with which our district courts are invested under the constitution is that administered in the high court of chancery in England. They are not, like the English exchequer, charged with the collection of debts due the state, nor with the collection of the public revenues; nor are they organized with any especial reference to the recovery or protection of state lands, whether above or below the level of tide water.

**Wharves—Power of Courts to Prevent Construction.**—The district courts have no power to decree the destruction or to enjoin the erection of a wharf, unless it is or will be a nuisance, or is or will be followed by some form of irreparable damage, or unless it is or will be an appreciable hindrance to the execution of some legislative act relating to fishery or to commerce or navigation.

APPEAL from Fourth Judicial District, San Francisco County.

Wm. Hall for respondent; H. and C. McAllister for appellants.

SHAFTER, J.—This is a bill to restrain the defendants from erecting a wharf from the north line of Chestnut street in the city of San Francisco toward and into the deep waters of the bay. It is alleged that the wharf, should it be erected,

will greatly interfere with and hinder the trade and commerce of the state at the harbor of said city, and greatly diminish its value, wherefore the plaintiffs pray that the erection of the wharf may be enjoined.

The court has found among other things that the defendants were engaged at the commencement of the action in constructing a wharf at the point mentioned, but has also found "that said wharf, so being built and proposed to be built by defendants, was not and would not be a nuisance, and was not injuring and would not injure the harbor of San Francisco, or the shipping or commercial interests thereof, or the people of the state of California." On the findings the court below dismissed the action.

First. We cannot go behind the findings, for the testimony is not before us; and the only question for us to consider is, whether, assuming the findings, the judgment is to be regarded as erroneous.

The gist of the action in one aspect of the case is a threatened injury to commerce and navigation resulting or to result from the erection of a wharf in a public harbor. The wharf may be an intrusion or encroachment upon tide waters and the soil thereunder belonging to the state, but the encroachment would not therefore be a public nuisance nor an injury to the harbor by legal conclusion. Lord Hale says (De Jure Marvis, 11): "It is not every building below the high-water mark that is, ipso facto, in law, a nuisance. For that would destroy all the keys that are in all the ports of England, for they are all built below the high-water mark." All the authorities concur in holding that whether any given encroachment upon a public or private right is a nuisance or not is a question of fact, and there have been at least two decisions to that effect in this state: Gunter v. Geary, 1 Cal. 466; Middleton v. Franklin, 3 Cal. 241. Where the court is satisfied that the encroachment or other matter complained of is not a nuisance, an injunction is necessarily refused, or dissolved if one has temporarily been granted: 2 Eden on Injunctions, 272.

Second. The complaint, in addition to the aspect under which we have thus far considered it, was doubtless intended also as a bill to enjoin or abate a purpresture—that is, an intrusion or encroachment upon tide waters and the soil

thereunder—without any reference to the effect of the encroachment upon public interests, whether to injure or to promote them.

Assuming the complaint to bear the double aspect of a bill to abate a nuisance and, as distinct therefrom, to enjoin or abate a mere purpresture, two questions are presented for consideration: First, Does the block in question belong to the appellants? and Second, If it belongs to the state as alleged in the complaint, can the further erection of the wharf be enjoined, and can it be abated in equity in so far as it has been proceeded with?

It is not only admitted but claimed by the appellants that the land belonged originally to the state, and that the title passed to those under whom the appellants claim, by legislative grant made on the 14th of May, 1861: Acts 1861, p. 363. The act is entitled ''An act to provide for the sale of marsh and tide lands of this state.'' The first section confirms all sales of such lands previously made, and provides for future purchases outside of certain localities mentioned, and then proceeds as follows: ''Provided, further, that no sales of lands. either tide or marsh, excepting alcalde grants, which are hereby ratified and confirmed, within five miles of said cities (San Francisco and Oakland) or within one mile and one-half of the state prison grounds aforesaid, shall be confirmed by this act.''

It is admitted that the block described in the complaint was covered by alcalde grants made in the year 1848, and that those grants conveyed no title to the grantees.

The subject matter of the act is ''marsh and tide lands.'' The sales which the act confirms, and the sales which it authorizes thereafter, as well as the sales which it inhibits, are of lands falling within this general description; and as we know of no principle upon which we can extend the subject matter beyond the limits expressly put upon it both by the title and the provisions of the act, we consider that the grants intended to be confirmed were alcalde grants of marsh and tide lands, to the exclusion of all others.

That portion of the block upon which the defendants were engaged in driving piles at the commencement of the action was below the line of low water, but as to whether the balance of the lot was permanently submerged at the date of the

act the findings are so far in conflict with each other that
we are unable to determine. However the fact may be, it is
admitted that the lands lying below the line of low water can-
not be regarded as "marsh," nor do we consider that they
can be regarded as "tide lands" in the sense in which those
words are used in the act of 1861.

The phrase "tide lands," considered as a term of descrip-
tion, is unknown, so far as we are advised, in the law of tide
waters; and it is certain that they were put to use for the
first time in the legislation of this state in the act of May 13,
1861. Prior to that time the lands offered for sale by the
state, having any connection with the present question, were
described as "swamp and overflowed." In the act of the
13th of May, 1861, the lands to which it relates are described
as "swamp and overflowed, and salt marsh and tide lands,
donated to the state by act of Congress." There is not only
no definition given of the new terms introduced, but the ques-
tion of their meaning is still further embarrassed by the cir-
cumstance that no lands had then been donated to this state
by Congress which can be considered as tide lands in any
sense; nor has any such donation been made since. In the
act of the 14th of May, 1861, passed the day after the act
last mentioned, the word "marsh" is not qualified by the
word "salt," and in various acts that had been passed since
that date, the general subject has been still further embar-
rassed by invention. We have now to deal not only with
"swamp and overflowed," "tide lands," "marsh lands" and
"salt marsh," but with lands that are simply "overflowed,"
"tidal lands," "submerged lands," "overflowed and sub-
merged" and "mud flats."

We find nothing in the act of May 14, 1861, affording the
slightest clue to the sense in which the legislature used the
words "tide lands" therein, and the act of the day previous,
in which the phrase was introduced for the first time, is
equally barren of suggestion. Under such circumstances that
definition must be adopted which on the whole is most reason-
able, and that is supplied in our judgment by the word
"strand," "beach" or "shore" in the common-law sense of
the terms.

Lands below the line of low water are usually spoken of as
such, or as the bottom of the sea, or gulf, or bay, or as lands

lying in deep water. Further, "tide" is obviously used in the act as a term of distinction.; but lands permanently submerged are distinguished for no purpose either useful or real by calling them tide lands. While it is claimed that the words are applicable to lands below the line of low water, it is admitted by counsel that they include also lands lying above it; the words, therefore, as thus defined, do not present or go upon the real distinction between the two classes of lands, and they are therefore valueless for the purpose of legal or scientific classification or arrangement. Further, if the words are applied to lands below the low-water line, then they would not stop at the channel but would reach to the opposite shore.

As opposed to all this, if the phrase is applied to the "shore" only, the word "tide" notes an important physical change to which the "lands" with which it is coupled are periodically subjected. As thus interpreted the periphrase would be "lands which are covered and uncovered by the tide."

On the ground, then, that the larger meaning ascribed to the words overlooks a real and governing difference, and, generally, on the ground that the definition would be entirely valueless for the purposes of arrangement, while the more restricted definition presents the difference named and therein subserves the very purpose to which all definition is appointed, we consider it more reasonable to hold that the legislature used the words in question as applicable to lands lying upon or constituting the "shore" rather than as including them, together with other lands differing specifically from them, and extending indefinitely beyond them into deep water. The result is that the block, in so far as it lies below the line of low water, belongs to the state, and the wharf, in so far as it has been built, is a purpresture. We shall now proceed to the second branch of the inquiry.

The district courts have no power, as courts of equity, to decree the destruction of a naked purpresture nor to restrain one if threatened. The intrusion, whether perfected or threatened, is not distinguishable, so far as the question of equitable cognizance is concerned, from intrusions upon uplands belonging to the public or to individuals. In all such cases parties are left to their strictly legal remedies unless they can make out a case of damage irreparable at law.

Though it is now settled that a court of equity may take jurisdiction in cases of public nuisance by an information filed by the attorney general, the jurisdiction seems to have been acted on with great hesitancy and caution. Thus it is said by Lord Eldon, "that instances of the interposition of a court of equity in England in such cases are confined and rare; and more information on the subject is to be collected from what has been done in the court of exchequer upon discussion of the right of the attorney general, by some species of information, to seek on the equitable side of that court relief as to nuisance, than from any other quarter": Attorney General v. Cleaver, 18 Ves. 211. Chancellor Kent, in Attorney General v. Utica Insurance Co., 2 Johns. Ch. (N. Y.) 382, remarks "that the equity jurisdiction in cases of public nuisance in the only cases in which it had been exercised, that is, in cases of encroachment on the king's soil, had lain dormant for a century and a half—that is from Charles I down to 1795. But the jurisdiction has been sustained upon the principle that equity can give more adequate and complete relief than can be obtained at law. Whilst, therefore, it is admitted by all that it is one of delicacy, and accordingly the instances of its exercise are rare, yet it may be exercised in those cases in which there is imminent danger of irreparable mischief before the tardiness of the law could reach it."

It was held in Rowe v. Granite Bridge Company, 21 Pick. (Mass.) 344, "that where it is obviously necessary that a nuisance should be immediately suppressed, as in case of a powder-house, or a slaughter-house, or a chemical laboratory, equity will interfere until the slower process by indictment could be put in motion."

A bill or information was filed in the court of chancery in New Jersey by the attorney general in the name of the state, charging the defendants with being in the act of erecting a bridge over the Passaic river, which is a navigable stream, in such a way as to interfere materially with the navigation; and it called upon the court, on the ground that the bridge would be a serious detriment to the community and a public nuisance, to interfere and prevent the further erection of the same, and also to order the same to be abated. The information charged that great mischief and irreparable injury would ensue to the public by the erection of the bridge.

But the application for an injunction was denied, on the ground that a court of equity ought not to interfere in a case of misdemeanor when the object sought can be as well attained in the ordinary tribunals; and under the facts as made out, the court considered that the proper course was by indictment at common law: Attorney General v. N. J. R. & Trans. Co., 3 N. J. Eq. (2 Green Ch.) 136.

Courts of equity have no criminal jurisdiction, and public nuisances are misdemeanors. This accounts for the peculiar disinclination to which the foregoing authorities refer, while the cases, in their turn, fix the instances in which the disinclination has been resisted and overcome.

The clear result is, that if a wharf built or threatened to be built upon tide lands, or below the line of low water, without public authority, is or would be injurious to commerce and navigation, and proceedings at law would not be adequate to the emergency, the erection may be abated or enjoined in equity; but where the wharf is not or would not be attended with any such result, the equitable jurisdiction fails and the people are left to their legal remedies. If the soil in this case belongs to the state—and such is the theory of the bill— then the wharf if erected will belong to it also. The defendants will be unable to collect wharfage, and will have no rights except those belonging to the public at large. Possession of the land and wharf, should it be withheld, can be recovered in ejectment, and thereafter the wharf can be managed by the state according to its own views of public good: Angell on Tide Waters, 218.

It is thought that there is no case in the books in which a court of equity, as such, has ever abated or enjoined a purpresture simply on the ground that it was one. The judicial department of the English court of exchequer is divided into one of equity and one of law; and the primary business of the former is to recover lands belonging to the crown; so that purprestures upon arms and creeks of the sea are the proper subjects of information in that court: Attorney General v. Richards, 2 Anst. 606; Attorney General v. Johnston, 2 Wils. Ex. 101. The title to the soil is in the king by private right (jus privatum) subject, however, to the public right (jus publicum) of fishery and navigation; and the attorney general may proceed for the purpose of protecting the private

right from the purpresture or the public right from nuisance, by information on the king's remembrancer's side of the exchequer, by English bill, praying a personal decree against the defendant in the suit. The question of nuisance, as being a matter of fact, the court may determine on evidence, or it may direct an issue: Attorney General v. Parmenter, 10 Price, 378; Attorney General v. Barridge, 10 Price, 350. If the erection complained of appears to be a purpresture without being at the same time a nuisance, the court may direct an inquiry to be made whether it would be more beneficial to the crown to abate the purpresture or to suffer the erection to remain and be arrented; but if the purpresture were also an injury to the public right of fishery and navigation, with which the crown has nothing to do except to conserve them, no such inquiry will be had, and the nuisance will be decreed to be abated: 2 Story's Equity Jurisprudence, 233, 922; Angell on Tide Waters, 201; 2 Anst. 606.

From this it would seem that in the exchequer, when it appears that the purpresture is a nuisance, that is, an injury to the jus publicum, a decree to abate follows as a matter of course; but if it is found, as in the case at bar, that the purpresture is not a nuisance, then so far as the public stands related to the proceedings, the suit is at an end, but the information is retained for the purpose of ascertaining the effect of the purpresture on the private right of the king; and the decree, allowing the purpresture to stand or adjudging its destruction or removal, depends upon the result of the inquiry. This procedure is clearly referable to the peculiar relation existing between the exchequer and the crown, and it was so considered by Chancellor Kent in Attorney General v. Utica Ins. Co., 2 Johns. Ch. (N. Y.) 381.

When the district court found that the wharf in question would work no detriment to the public rights of which the state is but the conservator, it could not do otherwise than deny the injunction and dismiss the bill, unless it can be made out that the district courts in this state bear the same relation to the state as the property owner, and to the state revenues, as that borne by the English exchequer to the crown and its revenues; and we conceive that those courts stand in no such relation.

The equity jurisdiction with which our district courts are invested under the constitution is that administered in the high court of chancery in England. They are not, like the English exchequer, specially charged with the collection of debts due to the state, nor with the collection of the public revenues; nor are they organized with any especial reference to the recovery or protection of state lands, whether above or below the level of tide water. They will protect such lands by injunction, but it is only in cases where like protection would be given to the lands of individuals—that is, in cases of threatened injuries which, if committed, would be irreparable at law. To that extent the justice administered is preventive and not remedial. But we are at loss to conceive upon what ground it can be claimed that the district courts, in the exercise of remedial justice, can, with a jury or without it, decree the demolition of any erection upon the public domain for the reason simply that it was put there without leave. In a case reduced to that degree of meagerness, not only is the nuisance feature wanting, and the irreparable damage feature also, but the case has no damage in it; and furthermore it might appear, as a fact in the case, that the purpresture was positively and largely beneficial. If a district court can, in the exercise of its equitable powers, decree the destruction of purprestures as such, then it can do in equity what cannot be done in this country on indictment (Angell on Tide Waters, 209), and the power furthermore must proceed from a source entirely foreign to the principles upon which the equity jurisdiction is admitted, on all hands, to be founded.

Again: Wharves in themselves considered are not of evil consequence, but the reverse, and we consider that neither the district courts nor any other court can prevent their erection or decree their destruction simply upon the ground that they are erections upon public lands, placed or to be placed there without license. It is enough that parties volunteering in the business can acquire no rights as against the state; that the state may, through the proper executive agencies, at any time take possession of its own or recover possession thereof by judicial proceedings, and being in possession, that the executive department through the officers to whose discretion the economical question may have been intrusted, can preserve them if useful or abate them if they cannot be made to con-

tribute to the public good. The courts can order them to be abated only when they are found to be pernicious.

The English exchequer even, specially charged as it is with the collection of the king's debts and duties, and with the ordering of his revenues and the protection of his property, is not in the habit of decreeing the abatement of wharves, or moles, or embankments on the line of navigable waters, upon the ground of purpresture merely, but considerately stays its hand until it has determined whether the marine revenues of the crown will be helped or damaged by demolition. In this state the district courts, as already stated, cannot halt in the exercise of their judicial powers upon any such question; but it does not therefore follow that they should, or can, blindly decree the destruction of every unlicensed pier and bulkhead in the state for no better reason than it is unlicensed; but on the contrary it would seem if they cannot, like the English exchequer, abate intelligently in cases of pure purpresture, that they ought not in such cases to abate at all. Lord Holt says: ''Where the soil is the king's the building below the high-water mark is purpresture, an encroachment or intrusion upon the king's soil which he may either demolish, or seize or arrent, at his pleasure.'' The state, in cases of mere purpresture, has the same powers in respect to its tide-water lands, but the courts can neither determine nor know its ''pleasure'' concerning the alternatives mentioned. They are incompetent to decree that a naked purpresture should be ''seized'' or ''demolished''; for the same reason they cannot decree that it shall be ''arrented.'' The course to be pursued in such cases depends upon sovereign ''pleasure,'' and therefore it cannot be turned into a question of public justice.

So far as we are advised there is no American case, at least, in which the power here claimed for the district courts to abate mere purprestures upon tide lands has ever been exercised. On the contrary, the courts have uniformly refused to interfere in such cases, unless the erection complained of was a nuisance or threatened irreparable damage. Of these cases the one cited from 2 Green is a sample.

By the civil law to repair and strengthen the banks of public rivers is permitted as being most useful, provided navigation be not impeded; and one who built a mole into the sea was protected if no one was injured thereby. The judicial

decisions in the maritime states of the Union, recognizing the usages of the people as molded by the necessities of a new country, have been conceived to some extent in the same spirit. Should we hold that wharves and other like improvements upon all the navigable waters in this state may be abated in equity for no better reason than that the state did not formally license their erection, we should go further than any American court has ever gone, and if the innovation were not followed by results greatly prejudicial to fishery and navigation, the credit of the escape would not belong to the doctrine.

We do not intend in this opinion to deny the power of the state to deal with its tide-water lands through the legislative and executive departments of the government, in such manner as shall be thought most conducive to the public good. All that we intend to decide is, that the district courts have no power to decree the destruction or to enjoin the erection of a wharf, unless it is or will be a nuisance, or is or will be followed by some form of irreparable damage, or unless it is or will be an appreciable hindrance to the execution of some legislative act relating to fishery or to commerce or navigation.

The order appealed from is reversed and the judgment is affirmed.

We concur: Currey, C. J.; Rhodes, J.; Sawyer, J.; Sanderson, J.